UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| K JARRED FLYNN,<br><br>　　　　Plaintiff,<br><br>v.<br><br>CROSSVILLE HOUSING AUTHORITY,<br><br>　　　　Defendant. | Case No. 2:19-cv-00094<br><br>Chief Judge Waverly D. Crenshaw, Jr.<br>Magistrate Judge Alistair E. Newbern |

To:　　The Honorable Waverly D. Crenshaw, Jr., Chief Judge

## REPORT AND RECOMMENDATION

Plaintiff Keith Jarred Flynn, who appears pro se, brought this action against his former employer, Defendant Crossville Housing Authority (CHA), alleging that CHA discriminated and retaliated against him in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12112–121117, after he sustained a back injury in the course of his employment. (Doc. No. 1.) Both parties have moved for summary judgment under Federal Rule of Civil Procedure 56. (Doc. Nos. 44, 68.) Considering the parties' arguments and the summary judgment record, and for the reasons that follow, the Magistrate Judge will recommend that CHA's motion for summary judgment (Doc. No. 68) be granted and that Flynn's motion for summary judgment (Doc. No. 44) be denied.

1

## I. Factual and Procedural Background[1]

Flynn worked as a maintenance aide for CHA, which is a Tennessee public housing authority. (Doc. No. 68-1.) In that position, Flynn performed a wide variety of tasks, including cleaning, laying flooring, patching concrete, making apartment repairs, painting, plumbing, pressure washing, maintaining the lawn, and other general maintenance work. (Doc. No. 82-4). Flynn reported to Maintenance Supervisor Benny Hill as his direct supervisor and to CHA's Executive Director Kathy Vanlandingham. (Doc. No. 42-2, PageID# 1549; Doc. Nos. 68-1, 82-4.)

While on duty on March 7, 2019, Flynn was in an automobile collision. (Doc No. 42, PageID# 949–53.) Flynn went to the emergency room with back pain on the day of the collision and again on March 13, 2019. (*Id.* at PageID# 958, 965.) Flynn also sought care from Dr. Robert Sapp, his primary care physician, and from Dr. Prayah Patel, who had performed back surgery on Flynn in May 2018. (Doc. Nos. 72-2, 72-4.) Flynn's medical records show that he had appointments with Taylore Marie Grimm, PA, in Dr. Patel's office on March 11, April 1, and May 13, 2019, and reported moderate-to-severe radiating pain in his lower back that began with the accident and worsened throughout March. (Doc. No. 42, PageID# 1072–75; Doc. Nos. 72-2, 72-4.) Grimm prescribed Flynn oral steroids and referred him to Dr. Paul Hoffman, another doctor in Dr. Patel's neurosurgery group, for steroid injections. (Doc. Nos. 72-2, 72-4.) Flynn received injections from Dr. Hoffman on May 6, July 16, and August 6, 2019. (Doc. No. 42, PageID# 1069, 1076, 1083; Doc. No. 72-2.) Flynn had appointments with Dr. Sapp on April 24, May 8, and May 28, 2019, and reported that the steroid treatment provided only temporary relief from his back pain.

---

[1] The facts in this section are drawn from the parties' summary judgment affidavits and exhibits (Doc Nos. 42–42-2, 55, 68-1, 72-1–72-4, 82-1–82-4), including excerpts from Flynn's deposition (Doc. Nos. 72-1, 82-4) medical records (Doc. Nos. 42, 72-2, 72-4). In granting summary judgment to CHA, the Court has drawn all reasonable inferences in the light most favorable to Flynn. *See Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009).

(Doc. No. 72-2.) At an August 6, 2019 appointment with Dr. Sapp, Flynn stated that he had "sensed a pop in his lower back" following the second steroid injection and, after that, "his pain dramatically decreased," returning to the baseline level from before the accident in March. (Doc. No. 72-2, PageID# 2754.)

Flynn states that he repeatedly left early or was absent from work in March, April, May, and June 2019 due to his back pain without requesting leave in advance under company policy, the Family and Medical Leave Act (FMLA), workers' compensation, or short-term disability. (Doc. Nos. 72-1, 72-2, 82-4.) On April 24, 2019, Flynn obtained a letter from Dr. Sapp and submitted it to his supervisors. (Doc. No. 68-1, 72-1.) The letter stated:

> Flynn was seen in my clinic on 4/24/2019 . . . . Please excuse [Flynn] for his absence from work on this day to make the appointment, also, patient is limited to how many hours a day he can work due to back injury.

(Doc. No. 42, PageID# 993.) CHA management found that the note provided an excuse for Flynn missing work on that day, but did not otherwise excuse Flynn's other absences. (Doc. No. 68-1.) Accordingly, on April 29, 2019, Hill issued a disciplinary write-up stating that "[Flynn] has missed an excessive amount of work due to back hurting." (Doc. No. 42, PageID# 994; Doc. No. 72-1.) Flynn does not assert that this write-up triggered any further disciplinary consequences.

Vanlandingham then met with Flynn to discuss the significance of Dr. Sapp's statement that "patient is limited to how many hours he can work." (Doc No. 42, PageID# 993; Doc. Nos. 68-1, 72-1.) Flynn told Vanlandingham that his doctor's instructions were "[w]henever you're hurting, don't overdo it and go home." In his deposition, Flynn confirmed "that was the accommodation[ ] that [he] asked for[.]" (Doc. No. 72-1, PageID# 2593.) Vanlandingham told Flynn that the note was not sufficiently specific to permit CHA to determine what work accommodations his back pain required and that CHA would need a doctor's statement including details such as how many

3

hours a day he could work and what physical activities he was and was not able to do. (Doc No. 68-1, 72-1.) Flynn responded to Vanlandingham that, "if they want that type of excuse, they need to send me to a work-comp doctor." (Doc No. 68-1; Doc. No. 72-1, PageID# 2591.) The one other doctor's note that Flynn provided to CHA was from Dr. Hoffman following the first steroid injection on May 6, 2019, and cleared Flynn to return to work on May 9, 2019, without specifying any limitations on his hours or duties. (Doc. No. 42, PageID# 1167.) Flynn does not dispute that Vanlandingham urged Flynn to apply for FMLA leave or to provide additional doctors' statements about his work restrictions on multiple other occasions. (Doc. Nos. 1, 68-1, 72-1, 82-4.)

Flynn continued to work "'extremely varying hours'" without any agreed-upon accommodation, advance request for leave, or further documentation provided by his doctors. (Doc. No. 72-1, PageID# 2598.) Flynn admits that his work attendance was "'sporadic.'" (Doc. No. 72-1, PageID# 2598.) Flynn states that "it was [his] intention[ ] to work whatever [he] could, whether it be four hours, whether it be six hours, or whether it be two hours[,]" and that "some days [he would] work six hours, and some days [he] could only work 15 minutes." (Doc. No. 72-1, PageID# 2604, 2607.)

Flynn alleges that, during this time after the accident, CHA made his job "increasingly harder." (Doc. No. 82-4, PageID# 3157.) When asked for examples of this treatment, Flynn testified that he was tasked with pressure-washing, picking up five-gallon buckets of paint, and patching concrete in cold and rainy weather. (Doc. No. 82-4.) Flynn also admitted, however, that these were all tasks he had been assigned before the March accident and that his objection was that, "instead of shifting [his assignments] to something that would have been a little easier on [him] because [Hill] kn[ew] [Flynn] was hurt, [Hill] was still sending [him] out to do that same job [he] had done before the car accident . . . ." (*Id.* at PageID# 3157.)

4

Flynn represented in a June email to CHA management that, after he was assigned to pressure-wash in May, he missed work from May 17 through May 23, 2019, because he was "in to[o] much pain, and having to walk on [a] cane from pressure washing, to make it in those days." (Doc. No. 42, PageID# 1009; Doc. No. 82-4.) Per CHA policy, an employee who misses more than three consecutive days of work is required "to return a doctor's statement" (Doc. No. 68-1, PageID# 2538). Flynn states that he was familiar with this policy but did not provide a doctor's note for these missed days. (Doc. No. 42, PageID# 1007–1011; Doc Nos. 68-1, 72-1.)

On May 17, 2019, Flynn filed a complaint with the Tennessee Human Rights Commission (THRC) for discrimination and retaliation. (Doc. No. 42, PageID# 998–1001.) Flynn also brought an internal grievance to CHA signed May 20, 2019, in which he stated that he was "filing a complaint of discrimination/hostile work environment and gross negligence" against his supervisors and "requesting to meet in front of the board." (*Id.* at PageID# 1006.) Jessica Stuhr, an administrative assistant with CHA, informed Flynn by email that his "request to speak with the Board of Commissioners regarding personnel issues has been denied. Any complaint or discussions related to personnel policy issues shall be processed according to our normal policy and procedure." (*Id.* at PageID# 1012.)

When Flynn returned to work after the pressure-washing assignment on May 24, 2019, he began to clock in for only short periods of time, on multiple occasions for less than an hour a day. (*Id.* at PageID# 1059; Doc. No. 42-2, PageID# 1411–13, 1581–82; Doc. No. 72-1.) Flynn stated that, on some days, he would stay for only "12 or 15 minutes" and that, on at least two days, he had "immediately clock[ed] back out and le[ft]" after staying five minutes or less because "[s]ometimes it took all [he] could do just to get to work and come across the parking lot." (Doc. No. 72-1, PageID# 2601, 2607.)

5

Stuhr emailed Flynn on June 4, 2019, to instruct him that he would not be able to clock in at work until he provided a doctor's note excusing him for the days he had missed and clearing him to return to work going forward. (Doc. No. 42, PageID# 1007.) Flynn responded that "the Dr excuse [Dr. Sapp] gave [him] on 4-24-19 is still valid" and that, if CHA wanted any additional doctors' notes, "some[]one on housing side or work comp should have sent [him] to a Dr." (*Id.* at PageID# 1009.) Stuhr reiterated in a June 11, 2019 email that Flynn would "not be allowed to report to work until [he] ha[d] presented the appropriate doctor's excuse for the missed time and a doctor's return to work authorization." (*Id.* at PageID# 10011.) Her email also stated:

> Since we believe your lack of reporting to duty is due to a medical reason and may be considered a disability, you may request a reasonable accommodation for your limitations. Please submit the attached authorization form and return to us by June 14, 2019. We will then contact your specified physician for information on your disability and any restrictions you may have. With this information we can consider a request for accommodation.

*Id.* Flynn does not dispute that he did not complete the attached authorization or provide any other medical documentation. (Doc. No. 82-4.)

On each weekday from June 7 through June 24, 2019, Flynn arrived at work and was informed by his supervisor that he was not permitted to clock in. (Doc. No. 42, PageID# 1051–58.) On June 24, 2019, CHA's counsel provided a letter to the attorney CHA believed had represented Flynn in his workers' compensation claims.[2] (*Id.* at PageID# 1059.) The letter states in pertinent part:

> For the past few weeks, Mr. Flynn has been showing up at the facility, clocking in and then immediately clocking back out and leaving. On June 7th, he was met at the door and told by his supervisor that he could not continue this practice. Since then, he is still showing up each day and attempting to clock in. We have told him time and time against that he is not to do this as it is causing multiple issues in the facility and is extremely disruptive.

---

[2] Flynn refers to this letter throughout his filings as the "cease and desist" letter. (Doc. Nos. 1, 45.)

6

> Please advise your client to immediately cease this practice. If he is unable to work, there is no reason for him to come into work, much less to clock in and immediately out every day. In addition, he will need to prove a provider's statement excusing his absences.

(Doc. No. 42, PageID# 1059.) Flynn did not try to clock in or to otherwise contact CHA management about returning to work after June 25, 2019. (Doc. Nos. 68-1; 72-1.) Flynn was terminated from his employment at CHA on July 20, 2020.[3] (Doc. No. 42-1, PageID# 1096.)

Flynn filed a second THRC complaint on June 14, 2019. (*Id.* at PageID# 1136, Doc. No. 42-2, PageID# 1347–1354.) On July 25, 2019, THRC issued a letter stating that it "d[id] not have authority to investigate" Flynn's complaint because "it raises the issue of reasonable accommodations related to disability[,]" and was "transferring the case to the Equal Employment Opportunity Commission (EEOC) who has the authority to review and assess [Flynn's] complaint under the Americans with Disabilities Act . . . ." (Doc. No. 42-2, PageID# 1361–62.) The EEOC indicated that it was unable to conclude whether a violation had occurred and issued a right to sue letter to Flynn on August 2, 2019. (Doc. No. 42, PageID# 1004.)

Flynn timely filed a complaint on October 28, 2019, in the United States District Court for the Eastern District of Tennessee, alleging that CHA, Vanlandingham, and Hill failed to accommodate his disability and retaliated against him in violation of the ADA, 42 U.S.C. §§ 12112–12117. (Doc. Nos. 1, 8, 9.) That Court granted Flynn's application to proceed *in forma pauperis* and transferred the case to the Middle District of Tennessee. (Doc. Nos. 4, 5.) This Court screened Flynn's complaint under 28 U.S.C. § 1915(e)(2)(b) and found that Flynn had adequately

---

[3] Neither party explains the year-long gap between Flynn's last day worked and the termination of his employment. CHA states that Flynn "continued to pay health insurance premiums to CHA throughout 2019 and the first 5 months of 2020, making some such payments [] in person" but "never once asked about returning to work." (Doc. No. 55, PageID# 2072.)

7

alleged claims against CHA under the ADA for failure to accommodate his disability and for retaliation.[4] (Doc. Nos. 8, 9.) The Court allowed those claims to proceed against CHA and dismissed Flynn's claims against Vanlandingham and Hill. (Doc. No. 9.)

On March 22, 2021, Flynn filed a motion for summary judgment on his failure-to-accommodate and retaliation claims (Doc. No. 44). CHA responded in opposition (Doc. No. 55), and Flynn filed a subsequent brief in support of his motion that the Court construes as a reply (Doc. No. 57). CHA filed a cross-motion for summary judgment on May 24, 2021, arguing that it is entitled to summary judgment on Flynn's (1) "claim of disability discrimination under the Americans with Disabilities Act[,]" (2) "claim that CHA failed to reasonably accommodate him[,]" and (3) "claim of retaliatory discharge under TN State law." (Doc. No. 68, PageID# 2534.) Flynn filed a response in opposition to CHA's cross-motion (Doc. No. 82), with additional exhibits attached (Doc. Nos. 82-1–82-6), and CHA filed a reply (Doc. No. 83).

## II. Legal Standard

In resolving a motion for summary judgment, the Court must undertake "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Under Federal Rule of Civil Procedure 56, a court must grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect

---

[4] There were multiple disagreements between Flynn and CHA's management regarding the application of Tennessee's workers' compensation laws to the accident. (Doc. Nos. 68-1.) Flynn settled his workers' compensation claims through mediation in or around November 2019 (Doc. No. 42, PageID# 986–88; Doc. No. 42-2, PageID# 1433–34; Doc. No. 68-1).

the outcome of the suit under the governing law[,]" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating that no genuine issues of material fact exist. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its burden, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (citation omitted); *see also Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 282 (6th Cir. 2012) ("Once a moving party has met its burden of production, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))). The parties "must support" their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or, alternatively, by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B). Courts must view the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). However, if the moving party carries its initial burden, the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position. *Anderson*, 477 U.S. at 252. In order to proceed to trial, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Id.*

### III. Analysis

#### A. Failure to Accommodate Disability

9

Flynn claims that CHA violated 42 U.S.C. § 12112(b)(5)(A) of the ADA by failing to accommodate his need for fewer hours and less-strenuous tasks after his back injury. (Doc. No. 1.) Under the ADA, a qualifying employer must make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018) (quoting 42 U.S.C. § 12112(b)(5)(A)). To establish a prima facie failure-to-accommodate claim, Flynn must demonstrate that (1) he was disabled within the meaning of the ADA; (2) he was otherwise qualified for his position, with or without reasonable accommodation; (3) CHA knew or had reason to know about his disability; (4) he requested an accommodation; and (5) CHA failed to make a reasonable accommodation. *Id.* (citing *Deister v. Auto Club Ins. Ass'n*, 647 F. App'x 652, 657 (6th Cir. 2016)).

When an employee has requested an accommodation, the employee and the employer must participate in an "interactive process" to "'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'" *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007) (quoting 29 C.F.R. § 1630.2(*o*)(3)). "[T]he interactive process is mandatory, and both parties have a duty to participate in good faith." *Brumley*, 909 F.3d at 840 (6th Cir. 2018) (quoting *Kleiber*, 485 F.3d at 871). "Such interactive process is necessary because 'the law in this circuit does not entitle [an employee] to the accommodation of [his or] her choice, but only a reasonable accommodation.'" *Sloan v. Repacorp, Inc.*, 310 F. Supp. 3d 891, 900 (S.D. Ohio 2018) (alterations in original) (quoting *Black v. Wayne Ctr.*, Nos. 99–1225, 99–1249, 2000 WL 1033026, at *4 (6th Cir. July 17, 2000)). As part of the process, an employer may make inquiries into an employee's medical information "to

10

discover to what extent the employee is disabled and how the employee may be accommodated, if at all, in the workplace." *EEOC v. Prevo's Fam. Mkt., Inc.*, 135 F.3d 1089, 1095 (6th Cir. 1998); *see also* 29 C.F.R. § 1630.14(c) ("A covered entity may make inquiries into the ability of an employee to perform job-related functions."); *Kennedy v. Superior Printing Co.*, 215 F.3d 650, 656 (6th Cir. 2000) (holding that the employer "was entitled to require that [the employee requesting an accommodation] provide medical documentation sufficient to prove that he had a condition requiring accommodation"); *Eyster v. Metro. Nashville Airport Auth.*, 479 F. Supp. 3d 706, 715 (M.D. Tenn. 2020) ("An employer may require medical documentation confirming the employee's disability and supporting a proposed accommodation." (citing *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 812–13 (6th Cir. 2020))).

"When a party obstructs the [interactive] process or otherwise fails to participate in good faith, 'courts should attempt to isolate the cause of the breakdown and then assign responsibility.'" *Kleiber*, 485 F.3d at 871 (quoting *Bultemeyer v. Fort Wayne Cmty. Schs.,* 100 F.3d 1281, 1285 (7th Cir.1996)). "[A] party may fail to engage in the process in good faith . . . [by] failing to adequately communicate or provide information during the process." *Brumley*, 909 F.3d at 840 (citing *Kleiber*, 485 F.3d at 871).

Flynn cannot succeed on his failure-to-accommodate claim because no reasonable jury could find that he participated in the interactive process in good faith to identify what a reasonable accommodation of his injury would be. Flynn argues that CHA violated the ADA by "refusing to accept [his] doctor excuse limiting the hours he could work with the accommodation of working until [he] was hurting and needed to go home, and not overd[o] his back." (Doc. No. 57, PageID# 2110.) But "[t]he ADA does not obligate employers to make on-the-spot accommodations of the employee's choosing." *Brumley*, 909 F.3d at 840. Instead, employers and

11

employees are expected to work cooperatively to determine whether there are reasonable accommodations that will allow the employee to perform his or her essential duties. *See Sloan*, 310 F. Supp. 3d at 900.

Flynn does not dispute that, after receiving the April 24, 2019 note from Dr. Sapp, Vanlandingham attempted to determine more about his specific limitations and capabilities by asking him directly for that information and by requesting that he provide additional information from his doctors. (Doc. Nos. 72-1.) However, the summary judgment evidence and Flynn's consistent admissions in his filings show that Flynn responded to Vanlandingham only that his doctor advised him to "go home and rest" when he started to hurt and that, "if they want a better doctor's note[,] th[en] they should send him to their own doctor, but until then [Dr. Sapp's April 24, 2019] note would have to suffice." (Doc. No. 57, PageID# 2105–06.) Flynn does not dispute that CHA management repeatedly encouraged him to provide doctors' statements with more detail about what accommodations he required; Flynn also does not dispute that he "never returned a note that s[aid he was] limited in lifting or bending or stooping or climbing, or anything like that" (Doc No. 82-4, PageID# 3150), and did not otherwise give any information other than that he was "limited to how many hours a day he c[ould] work." (Doc. No. 42, PageID# 993).

Flynn asserts that he was unable to get more specific statements from his doctors because, even though they "wrote restrictions after . . . [his 2018 back] surgery on what [he] was allowed to do[,]" "whenever it bec[a]me a work-comp situation, they d[id]n't want [any] part of it." (Doc. No. 72-1, PageID# 2592.) Even if Flynn's doctors would not provide him with sufficient statements, however, Flynn does not dispute that he also did not provide CHA management with his own statement of what accommodations would allow him to do his job, other than proposing that he work "until I hurt/can't take it anymore and go home and not over[]do it" (Doc. No. 45,

12

PageID# 1720) and that, if they wanted any more specific findings, CHA needed to arrange for him to see a different doctor (Doc. No. 42, PageID# 1009). Because Flynn did not participate in the mandatory interactive process to determine a reasonable accommodation of his injury and, instead, unilaterally implemented a plan to set his own hours on a daily basis based on his back pain, no reasonable jury could conclude that CHA violated the ADA by denying Flynn a reasonable accommodation.

### B. Retaliation

Flynn also seeks summary judgment on his claim that CHA retaliated against him because he requested an accommodation and filed formal and internal complaints of discrimination. (Doc. Nos. 44, 45.) In its response in opposition to Flynn's motion for summary judgment, CHA argues that it did not take any adverse employment actions against Flynn and, in the alternative, that any adverse action was motived, not by retaliatory intent, but by Flynn's unexcused work absences and inconsistent schedule. (Doc. No. 55.) In its own motion for summary judgment, however, CHA does not address Flynn's claim of retaliation under the ADA. Instead, CHA moves for summary judgment on a claim of "retaliatory discharge under TN State law" that Flynn does not make. (Doc. No. 68, PageID# 2534.) CHA states that, "[w]hile difficult to determine, the crux of [Flynn's] Complaint appears to involve a claim under the Americans with Disabilities Act for alleged failure to accommodate, and a retaliation claim apparently based upon the worker's compensation claim." (Doc. No. 69, PageID# 2551.) CHA then argues only under Tennessee law that it did not retaliate against Flynn for protected conduct.

In its February 26, 2020 screening memorandum and order, this Court identified Flynn's two surviving claims as failure to accommodate a disability and retaliation under the ADA. (Doc. Nos. 8, 9.) CHA's argument that it could not determine the basis of Flynn's retaliation claim

13

therefore gains little traction. Thus, the Court is faced with the odd circumstance that, although CHA argued that Flynn should not be granted summary judgment on his claim of retaliation under the ADA, CHA did not argue that it is entitled to summary judgment on that claim.

The Court, however, has an independent interest in preserving judicial resources by ensuring that claims that cannot succeed as a matter of law do not proceed to a full trial. *See Wahl v. Vibranetics, Inc.*, 474 F.2d 971, 976 (6th Cir. 1973) (noting that, while summary judgment "should be granted only in the exercise of great restraint . . . [it] is proper where a trial would serve no useful purpose." (citations omitted)). Under Federal Rule of Civil Procedure 56(f), the Court may, "after giving notice and a reasonable time to respond . . . grant summary judgment for a nonmovant[.]" Fed. R. Civ. P. 56(f); *see Hankins v. Transcanada USA Servs., Inc.*, 22 F. Supp. 3d 844, 851 (M.D. Tenn. 2014) (finding that "'district courts are widely acknowledged to possess the power to enter summary judgment *sua sponte*, so long as the opposing party was on notice that she had to come forward with all of her evidence'" (quoting *Celotex Corp.*, 477 U.S. at 326)). When a party has moved for summary judgment on a particular claim—and has therefore had the opportunity and every incentive to produce his best evidence and argument in support of that claim—his rights to notice and time to respond before a court grants summary judgment against him on that claim have been fulfilled. *See Delphi Auto. Sys., LLC v. United Plastics, Inc.*, 418 F. App'x 374, 381–82 (6th Cir. 2011) ("[Plaintiff] Delphi was aware that the court was considering summary judgment on all of the claims it raised, because Delphi filed the motion that put those claims at issue before the court. . . . Moreover, Delphi had the opportunity to 'come forward with all of its evidence' because, in seeking summary judgment, it was required to present facts necessary to demonstrate that there was 'no genuine dispute as to any material fact and [that Delphi was] entitled to judgment as a matter of law.'" (third alteration in original)); 10A Charles Alan

14

Wright & Arthur R. Miller, Federal Practice and Procedure § 2720.1 (4th ed. updated Apr. 2021) ("When there has been a motion but no cross-motion, the judge already is engaged in determining whether a genuine dispute as to material fact exists and the parties have been given an opportunity to present evidence designed either to support or refute the request for the entry of judgment.").

Flynn has had ample opportunity through his own summary judgment motion to present his best arguments and evidence in support of his ADA retaliation claim. (Doc. Nos. 42, 45, 57, 82). After considering the parties' arguments in that context and viewing all facts in the summary judgment record in the light most favorable to Flynn, the Court will recommend that CHA be granted summary judgment on Flynn's ADA retaliation claim.

Where, as here, a plaintiff relies on indirect evidence to demonstrate an ADA retaliation claim, that claim is evaluated under the under the *McDonnell Douglas* burden-shifting analysis. *A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013). Under that framework, the plaintiff bears the initial burden of making a prima facie case of retaliation by showing that "(1) the plaintiff engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action." *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014) (citing *A.C. ex rel. J.C.*, 711 F.3d at 697). "If Plaintiff succeeds, there is a presumption of discrimination or retaliation, and the burden shifts to Defendants to articulate a legitimate, nondiscriminatory reason for the employment action." *Sharp v. Waste Mgmt., Inc.*, 47 F. Supp. 3d 584, 599 (S.D. Ohio 2014) (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000)), *aff'd sub nom. Sharp v. Profitt*, 674 F. App'x 440 (6th Cir. 2016). "Plaintiff must then rebut this reason by showing the proffered reason was pretext to hide Defendants' unlawful discrimination or retaliation." *Id.* (citing *Johnson*, 215 F.3d at 573). A plaintiff may show

15

that an employer's proffered reason is mere pretext by, for example, "showing that the proffered reason: (1) has no basis in fact; (2) did not actually motivate the employer's challenged conduct; or (3) was insufficient to warrant the challenged conduct." *Id.* at 602 (citing *Clay v. UPS,* 501 F.3d 695, 704 (6th Cir. 2007)).

Flynn cannot establish a prima facie case because he cannot show that most of CHA's allegedly retaliatory acts constitute adverse employment actions as a matter of law. "An 'adverse employment action,' for purposes of a retaliation claim, is conduct that might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Eyster*, 479 F. Supp. 3d at 719 (quoting *Hubbell v. FedEx Smartpost, Inc.*, 933 F.3d 558, 569–70 (6th Cir. 2019)). Flynn objects to CHA issuing him a written reprimand on April 29, 2019, for having "missed an excessive amount of work." (Doc. No. 42, PageID# 994.) But, "[i]n general, a negative performance evaluation does not constitute an adverse employment action unless the evaluation has an adverse impact on an employee's wages or salary." *Norman v. Rolling Hills Hosp., LLC*, 820 F. Supp. 2d 814, 823 (M.D. Tenn. 2011) (quoting *Hill v. Nicholson*, 383 F. App'x 503, 509 (6th Cir. 2010)); *accord Rio v. NHC/OP, L.P.*, 149 F. Supp. 3d 839, 845 (M.D. Tenn. 2016) (finding that "no-call no-show disciplinary write-up . . . fail[ed] to qualify as a materially adverse action" (citing *Zanders v. Potter*, 223 F. App'x 470 (6th Cir. 2007))). Flynn does not argue that he lost wages or salary because of this reprimand. Flynn also argues that he was retaliated against when he was denied the ability to meet with the CHA's Board of Commissioners regarding the internal grievance he submitted. (Doc. No. 1, 44.) But Flynn does not offer any evidence to show that CHA's response to his request that "[a]ny complaint or discussions related to personnel issues shall be processed according to our normal policy and procedure" denied him an opportunity that would have been

16

available to him otherwise, and therefore cannot show that CHA's decision could have dissuaded a reasonable employee from making a charge of discrimination. (Doc. No. 42 at PageID# 1012.)

Flynn further argues that CHA harassed him by assigning him more difficult tasks and by pressuring him to take FMLA leave and submit doctor's notes to support his claimed impairments. (Doc. No. 1, 44.) However, Flynn has presented no evidence from which a reasonable jury could conclude that he was subjected to "materially adverse" harassment that could have "'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (internal quotation marks omitted); *accord Eyster*, 479 F. Supp. 3d at 719 (quoting *Hubbell*, 933 F.3d at 569–70). While Flynn has consistently asserted that CHA made his job harder after he requested an accommodation, he clarified at his deposition that what he actually objects to is CHA not assigning him easier work to accommodate his injury. (Doc. No. 82-4.) In response to CHA's request at his deposition that he explain how CHA made his job harder, Flynn stated that, "instead of shifting [his assignments] to something that would have been easier on [him] since [Hill] kn[ew] [he] was hurt, [Hill] was still sending [him] out to the do the same job [he] had done before the accident." (Doc. No. 82-4, PageID# 3157.) Flynn also testified that all of these tasks were ones that he was assigned to perform before his injury. (Doc. No. 82-4.) Flynn's conclusory assertion that CHA made his job assignments more difficult without any factual support showing a material change in duties cannot create a genuine factual dispute that he suffered an adverse employment action. *Eyster*, 479 F. Supp. 3d at 719 (*citing Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020). To the extent Flynn asserts that he should have been assigned light duty instead of his regular job duties, that argument repeats his failure-to-accommodate claim, which fails as a matter of law for the reasons discussed above.

17

Flynn also claims that CHA harassed him when his supervisors asked him about applying for FMLA leave and for more specific doctors' notes. However, Flynn admits that CHA asked him to apply for FMLA leave (which would have benefitted Flynn) only "three or four times" and asked for doctors' notes to help determine his need for accommodations and to account for multiple missed workdays per company policy. (Doc. No. 82-4, PageID# 3153). Construing these facts most favorably to Flynn, a reasonable jury could not find that Flynn has shown harassment that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Eyster*, 479 F. Supp. 3d at 719 (quoting *Hubbell*, 933 F.3d at 569–70).

Flynn's allegation that CHA prohibited him from clocking into work does present an arguably materially adverse employment action for purposes of a retaliation claim. A reduction in work hours can constitute an adverse employment action. *Norman*, 820 F. Supp. 2d at 823. CHA argues that it did not generally prohibit Flynn from clocking in, but instead instructed him that he could not continue to clock in to work, only to clock out again minutes later. (Doc. No. 42, PageID# 1059; Doc. Nos. 55, 69, 72-1). Flynn, however, repeatedly testified in his deposition that Hill told him that he was not allowed to clock in at all. (Doc. No. 72-1.) Flynn's account is further supported by Stuhr's June 11, 2019 email telling Flynn that he would "not be allowed to report to work until [he] ha[d] presented the appropriate doctor's excuse for the missed time and a doctor's return to work authorization," and by the notes Hill signed confirming he was instructed not to permit Flynn to clock in. (Doc. No. 42, PageID# 10011, 1051–58.)) Accordingly, there is evidence to support a finding that CHA prevented Flynn from reporting to his job beginning on June 7, 2019.

However, even if Flynn can make out a prima facie case that CHA prevented Flynn from working, there is no evidence in the record to support a finding that that CHA's proffered non-

18

discriminatory reason for doing so was pretext for retaliation. CHA asserts in its briefing, as it did contemporaneously in its communications to Flynn, that it prevented Flynn from clocking in because he had been repeatedly clocking in and almost immediately clocking out and had missed multiple days of work without providing the required doctor's excuse. (Doc. No. 42, PageID# 1011, 1059; Doc. No. 69.) CHA states that it decided to stop Flynn's erratic and disruptive practice by allowing him to return to work only after he provided assurance in the form of a doctor's note that he was able to work his assigned shifts. (Doc. No. 69.)

Addressing Flynn's undisputed failure to provide documentation to support his absences and failure to work his shifts after clocking in is a legitimate nondiscriminatory reason for CHA to prevent Flynn from working until he obtained the required doctor's note. *See Townley v. Blue Cross & Blue Shield of Mich.*, 254 F. Supp. 2d 661, 670 (E.D. Mich. 2003) (holding that tardiness and "[a]bsenteeism [are] legitimate, nondiscriminatory reason[s] for terminating an employee." (citing *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 379 (6th Cir. 2002). The burden therefore shifts back to Flynn to demonstrate that, "not only were the employer's [stated] reasons false, but that retaliation was the real reason for the adverse action." *Sharp*, 47 F. Supp. 3d at 602 (quoting *Tingle v. Arbors at Hilliard,* 692 F.3d 523, 530 (6th Cir. 2012)).

Flynn has not offered any evidence to create a question of fact that CHA's asserted rationale is pretext and the real reason for CHA's actions was retaliation for Flynn having requested an accommodation or submitted discrimination complaints. Flynn does not deny that he did not provide the requested medical documentation or that he repeatedly clocked in and then clocked out again over the two weeks before CHA stopped him from doing so. Nor does he offer any evidence to suggest that CHA's proffered reason "did not actually motivate [its] challenged conduct . . . or was insufficient to warrant the challenged conduct." *Sharp*, 47 F. Supp. 3d at 602

19

(citing *Clay,* 501 F.3d at 704). No reasonable jury could conclude that retaliation for Flynn's protected conduct was "the real reason for the adverse action." *Id.* at 602 (quoting *Tingle,* 692 F.3d at 530).

**IV.     Recommendation**

For these reasons, the Magistrate Judge RECOMMENDS that Flynn's motion for summary judgment (Doc. No. 44) be DENIED and that CHA's motion for summary judgment (Doc. No. 68) be GRANTED.

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this report and recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 26th day of October, 2021.

ALISTAIR E. NEWBERN
United States Magistrate Judge